EDWARD MORRISSEY v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY.

FILED NOVEMBER 21, 1893.   No. 5653.

1. **Surface Water:** EMBANKMENT FOR RAILWAY PURPOSES. Where the gravamen of plaintiff's action was the alleged negligent, improper, and careless construction of an embankment, from which resulted the overflow of plaintiff's land, it is proper to presume, in the absence of proof on the subject, that said embankment was, for railway purposes, properly constructed.

2. **A water-course** must be a stream in fact as distinguished from mere surface drainage, rendered necessary by freshets or other extraordinary causes, though the flow of water need not be constant. Following definition by MAXWELL, J., in *Pyle v. Richards,* 17 Neb., 180.

3. **Surface Water:** OBSTRUCTION BY RAILROAD EMBANKMENT: DAMAGES: LIABILITY OF COMPANY. The term "surface water" includes such as is carried off by surface drainage,—that is, drainage independently of a water-course,—and for the construction of an embankment proper for railroad purposes, which deflects such surface water from its normal course, a railroad company is not liable in damages to the proprietor of neighboring lands thereby incidentally overflowed and injured.

ERROR from the district court of Johnson county. Tried below before BROADY, J.

The opinion contains a statement of the case.

*Daniel F. Osgood* and *Talbot & Bryan,* for plaintiff in error:

Where waters of a stream disperse themselves over low

ground, without any well marked course, but gather up lower down into a defined channel, they are not surface water while in the dispersed state, and interference with them gives the injured party a right of action. (*O' Connell v. East Tennessee, V. & G. R. Co.*, 13 S. E. Rep. [Ga.], 489; *Macomber v. Godfrey*, 108 Mass., 219; *Gillett v. Johnson*, 30 Conn., 180; *Briscoe v. Drought*, 2 Ir. C. L., 250; *West v. Taylor*, 16 Ore., 165; *Sullens v. Chicago, R. I. & P. R. Co.*, 74 Ia., 659; *Moore v. Chicago, B. & Q. R. Co.*, 75 Ia., 263.)

A person through whose land a stream of water flows may construct embankments to prevent overflow; but in doing this must so construct them as not to throw the water upon his neighbor's lands, where it would not otherwise go. (*Wallace v. Drew*, 59 Barb. [N. Y.], 413; *Montgomery v. Locke*, 11 Pac. Rep. [Cal.], 874; *Burwell v. Hobson*, 12 Gratt. [Va.], 322; *Crawford v. Rambo*, 44 O. St., 279; *Byrne v. Minneapolis & St. L. R. Co.*, 36 N. W. Rep. [Minn.], 339; *Rau v. Minnesota V. R. Co.*, 13 Minn., 442; *Gerrish v. Clough*, 48 N. H., 9; *Carriger v. East Tennesee, V. & G. R. Co.*, 7 Lea [Tenn.], 338.)

A railroad company, in constructing an embankment which affects the flow of surface water, must provide sufficient culverts and outlets for the surface water, so that its ordinary flow will not be affected by reason of building such embankment, and the embankment must be constructed in a careful and skillful manner, and if done carelessly and negligently, and without sufficient passage-ways, the company will be liable. (*Philadelphia, W. & B. R. Co. v. Davis*, 6 Am. St. Rep. [Md.], 440; *Ohio & M. R. Co. v. Wachter*, 123 Ill., 440; *Austin & N. W. R. Co. v. Anderson*, 23 Am. St. Rep. [Tex.], 351; *Rowe v. St. Paul, M. & M. R. Co.*, 41 Minn., 384; *Emery v. Raleigh & G. R. Co.*, 102 N. Car., 209; *Chicago, B. & Q. R. Co. v. Schaffer*, 124 Ill., 112.)

The owner of a dam is liable to his neighbor for injury done to his land by overflows occasioned by the dam, not

only in ordinary stages of the water, but in times of ordinarily recurring freshets. (*Casebeer v. Mowry*, 55 Pa. St., 419; *McCoy v. Danley*, 20 Pa. St., 85; *Bristol Hydraulic Co. v. Boyer*, 67 Ind., 236.)

The superior proprietor of land inundated by a stream breaking away from its channel may turn the water back, but cannot discharge it from his own on the lands of another by any but its own channel. (*Tuthill v. Scott*, 43 Vt., 525; *Armenlaiz v. Stillman*, 67 Tex., 459; *Farris v. Dudley*, 78 Ala., 124; *Gibbs v. Williams*, 36 Am. Rep. [Kan.], 242.)

*J. S. Harris*, also, for plaintiff in error.

*Isham Reavis, amicus curiæ*, on the same points made by plaintiff in error, cited: 1 Addison, Torts, 106; *Louisville & N. R. Co. v. Hays*, 47 Am. Rep. [Tenn.], 291; *Little Rock & F. S. R. Co. v. Chapman*, 43 Am. Rep. [Ark.], 280; *Gillham v. Madison County R. Co.*, 49 Ill., 484; *Drake v. Chicago, R. I. & P. R. Co.*, 19 N. W. Rep. [Ia.], 215; *Davis v. Londgreen*, 8 Neb., 43; *Pyle v. Richards*, 17 Neb., 180; *Omaha & R. V. R. Co. v. Standen*, 22 Neb., 343.

*J. A. Kilroy, T. M. Marquett*, and *J. W. Deweese, contra:*

The common law is adopted by statute and declared to be law in this state. (Con. Stats., ch. 26, sec. 2088; *Wilson v. Bumstead*, 12 Neb., 4.)

The case containing the generally accepted statement of the common law rule, as to right of the proprietor to obstruct or change the direction and flow of surface waters fully sustains the view expressed by the trial judge in the instructions given to the jury in this case. (*Gannon v. Hargadon*, 92 Mass., 106.)

The contrary rule is that of the civil law. (*Martin v. Riddle*, 26 Pa. St., 415; *Kauffman v. Griesemer*, 26 Pa. St., 407.)

The confusion in the decisions of the courts on surface water questions arises almost wholly in states that have undertaken to enforce the civil law rule. The civil law in its application to surface water has been adopted in the following cases: *Nininger v. Norwood*, 72 Ala., 277; *Osburn v. Connor*, 46 Cal., 346; *Gillham v. Madison County R. Co.*, 49 Ill., 484; *Livingston v. McDonald*, 21 Ia., 160; *Lattimore v. Davis*, 14 La., 161; *Philadelphia, W. & B. R. Co. v. Davis*, 34 Am. & Eng. R. R. Cas. [Md.], 143; *Porter v. Durham*, 74 N. Car., 767; *Butler v. Peck*, 16 O. St., 334; *Tootle v. Clifton*, 22 O. St., 247; *Crawford v. Rambo*, 44 O. St., 279; *Kauffman v. Griesemer*, 26 Pa. St., 407; *Louisville & N. R. Co. v. Hays*, 11 Lea [Tenn.], 382; *Boyd v. Conklin*, 20 N. W. Rep. [Mich.], 595; *Little Rock & F. S. R. Co. v. Chapman*, 39 Ark., 463; *Gillison v. Charleston*, 16 W. Va., 284.

The instructions given by the court to the jury in this case are sustained by the well established decisions of all the states adhering to the common law rule. (*Taylor v. Fickas*, 64 Ind., 173; *Cairo & V. R. Co. v. Stevens*, 73 Ind., 281; *Shelbyville & Brandywine Turnpike Co. v. Green*, 99 Ind., 215; *Cairo & V. R. Co. v. Houry*, 77 Ind., 364; *Morrison v. Bucksport & B. R. Co.*, 67 Me., 355; *Bowlsby v. Speer*, 31 N. J. Law, 352; *Chadeayne v. Robinson*, 55 Conn., 350; *Grant v. Allen*, 41 Conn., 156; *Gannon v. Hargadon*, 10 Allen [Mass.], 106; *Sweet v. Cutts*, 50 N. H., 439; *Buffum v. Harris*, 5 R. I., 253.)

The following cases hold that surface water can be treated as a common enemy, and fought against by embankments, ditches, or other obstructions, by any land-owner or railroad company in the construction of its road, without legal damage arising in favor of any party who is injured thereby: *Morrison v. Bucksport & B. R. Co.*, 67 Me., 356; *Greely v. Maine C. R. Co.*, 53 Me., 200; *Bangor v. Lansil*, 51 Me., 521; *Murphy v. Kelley*, 68 Me., 521; *Union v. Durkes*, 38 N. J. Law, 21; *Bowlsby v. Speer*, 31

N. J. Law, 351; *Grant v. Allen,* 41 Conn., 156; *Chadeayne v. Robinson,* 55 Conn., 349; *Bates v. Smith,* 100 Mass., 181; *Turner v. Dartmouth,* 13 Allen [Mass.], 291; *Flagg v. Worcester,* 13 Gray [Mass.], 601; *Gannon v. Hargadon,* 10 Allen [Mass.], 106; *Parks v. Newburyport,* 10 Gray [Mass.], 28; *Sweet v. Cutts,* 50 N. H., 439; *Jones v. St. Louis, I. M. & S. R. Co.,* 29 Am. & Eng. R. Cas. [Mo.], 523.

In this case the railroad company did not interfere with any natural water-course.    Water which once escapes from the banks of a natural channel, or a stream of water, by reason of a flood in the stream, occasioned by heavy rains or melting of snow upon the surrounding country, is surface water. (*McCormick v. Kansas City, St. J. & C. B. R. Co.,* 57 Mo., 438; *Benson v. Chicago & A. R. Co.,* 78 Mo., 504; *Abbott v. Kansas City, St. J. & C. B. R. Co.,* 83 Mo., 271; *Taylor v. Fickas,* 64 Ind., 168; *Cairo & V. R. Co. v. Stevens,* 73 Ind., 278; *Lessard v. Stram,* 62 Wis., 112; *Johnson v. Chicago, St. P., M. & O. R. Co.,* 80 Wis., 641; *Kansas City & E. R. Co. v. Riley,* 33 Kan., 374; *Jordan v. St. Paul, M. & M. R. Co.,* 42 Minn., 172; *Rowe v. St. Paul, M. & M. R. Co.,* 41 Minn., 384; *Moyer v. New York C. & H. R. R. Co.,* 88 N. Y., 351; *Bell's Exrs. v. Norfolk S. R. Co.,* 36 Am. & Eng. R. Cas. [N. Car.], 651; *Shane v. Kansas City, St. J. & C. B. R. Co.,* 5 Am. & Eng. R. Cas. [Mo.], 71.)

The railroad company was not obliged to make culverts through its embankments, but had the right to build obstructions and fight off surface water in the proper construction of a railroad track with the necessary embankments.    Still it would not be permitted to collect and concentrate surface waters by reason of its embankments, and then pour them through an artificial ditch or culvert in unusual quantities upon the land of adjacent proprietors. (*Fremont, E. & M. V. R. Co. v. Marley,* 25 Neb., 147; *Pyle v. Richards,* 17 Neb., 180; *Shane v. Kansas City,*

*St. J. & C. B. R. Co.,* 71 Mo., 237; *Cairo & V. R. Co. v. Stevens,* 73 Ind., 278; *Hoganon v. St. Paul, M. & M. R. Co.,* 17 N. W. Rep. [Minn.], 374; *Chicago & A. R. Co. v. Benson,* 20 Am. & Eng. R. Cas. [Mo.], 101; *McCormick v. Kansas City St. J. & C. B. R. Co.,* 70 Mo., 359.)

RYAN, C.

Plaintiff sued the defendant in the district court of Johnson county, Nebraska, for damages which plaintiff alleged had been caused him by the defendant's improper, negligent, and careless construction of a portion of its railroad, whereby the normal flowage of water over the land of plaintiff was greatly increased, causing the destruction, in 1888 and 1889, of crops and personal property thereon situated. Issue was duly joined and a trial resulted in a verdict for the defendant in accordance with the direct instructions of the court so to find.

The line of railroad of the defendant, running in an almost due westerly direction, crosses Yankee creek at a point about a quarter of a mile north and a little eastward of the northwest corner of the plaintiff's eighty-acre tract on which the alleged damage accrued. The Nemaha river is about one and a half or two miles north of above mentioned railroad crossing of Yankee creek, which empties its waters into said river. From the above crossing the line of railroad, continuing still in a westerly direction, touches the said creek at one of its numerous bends, from whence, pursuing the same westerly course for about one-fourth of a mile over bottom lands bordering on said creek, it reaches higher ground. There is no question made as to the necessity of putting in an embankment or other structure of the height of about eighteen feet between the point of contact of the railroad with Yankee creek and the higher ground, of which mention has just been made. An embankment was made without an opening through it, however, from which it resulted that the water which in former

Morrissey v. Chicago, B. & Q. R. Co.

freshets had been discharged over the bottom land now crossed by the embankment was arrested in its course towards the Nemaha river and diverted to Yankee creek, causing thereby an increased volume of water to seek an outlet by way of that creek and the bottom lands beyond it, including those of plaintiff. To this increased flowage of water plaintiff attributed his injuries complained of, and for those injuries sought to hold the defendant liable.

The defendant proved that along its eighteen foot fill it had dug borrow pits and caused them to connect by a ditch with Yankee creek, into which creek all the water which, but for the fill, would have flowed across defendant's right of way, was emptied into Yankee creek by way of said line of borrow pits and ditch. While the evidence showed that the ground occupied by the fill was not level, but rather that there was a slight elevation along the bank of the creek on one skirting side, and toward the bluffs on the other skirting side, yet the whole was tilled or grass land, and was in no respect the bed of a stream. No present mention is made of the elements of damage or other matters in evidence, for, as the decision of this court depends so largely upon the correctness of the district court's conception of the law applicable to such facts as have been already stated, that comment upon these matters should logically follow the instructions given the jury, which were as follows:

"1. A long time ago there was a difference in the law of surface waters between the law of continental Europe, called the civil law, and the law of England, called the common law, which difference has come down through the states of this union. The law of this state is with the common law, which is that upon the boundaries of his own land, not interfering with any natural or prescriptive water-course, the owner may erect such barriers as he may deem necessary to keep off surface water or overflowing floods coming from or across adjacent lands, and from any consequent repulsion.

turning aside or heaping up these waters to the injury of other lands, he will not be responsible; but such waters as fall in rain and snow on his land, or come thereon by surface drainage from or over contiguous lands, he must keep within his boundaries or permit them to flow off without artificial interference, unless within the limits of his own land he can turn them into a natural water-course, which he has a right to do.

"2. A railroad company, by its right of way, has the same right as a farm owner has to his farm, or any other land proprietor within the law of the above instruction, as to surface water.

"3. When and after water escapes from a natural stream by reason of a flood and spreads over the low lands, it is then surface water, and continues so until it gets back into some natural stream.

"4. The jury are instructed that a water-course may exist without a perpetual or constant flow of water; but there must be a channel in the ground showing the location of the stream, and it must be a stream in fact as distinguished from mere surface drainage caused by freshets or overflows of creeks or streams of water.

"5. Under the law as above given the undisputed testimony shows that the defendant obstructed only surface water, and not any water-course, and that defendant is not liable on the case made by the evidence in this case. You will therefore find for defendant."

The petition claims damages resulting from improper, negligent, and careless construction of the railroad embankment. There was no evidence of such improper construction as is alleged, except inferentially from proof, first, that the former course of a part of the surface water was over ground subsequently occupied by defendant's embankment; second, that before the embankment was made plaintiff's land had never been overflowed; third, that since the embankment had existed plaintiff's land had been overflowed

once in 1888 and once in 1889, the embankment having been made in 1882.

Plaintiff contends that if, by proper caution, the defendant might have avoided or prevented the injury to plaintiff's premises, the want of such caution is sufficient to justify a verdict for the necessarily resulting damages. (*Rau v. Minnesota V. R. Co.*, 13 Minn., 407; *Bellinger v. New York C. R. Co.*, 23 N. Y., 42; *Radcliff's Exrs. v. Mayor of Brooklyn*, 4 N. Y., 195; *Lawrence v. Great Northern R. Co.*, 16 Q. B. [Eng.], 643; *Crawford v. Rambo*, 44 O. St., 279.) In the case of *Gillham v. Madison County R. Co.*, 49 Ill., 484, Breese, C. J., delivering the opinion of the court, said: "The case was this: Plaintiff in error was the owner of a tract of land less elevated than the land in the neighborhood, from which all the water that fell upon it from rains or otherwise, flowed onto the land of the plaintiff, and which, by means of a depression in his land, ran off his land to adjoining land and thence into a natural lake. The defendant, the railroad company, made a large embankment on the line of plaintiff's land, entirely filling up this channel, thereby throwing the water back on plaintiff's land. Negligence in so doing, without leaving an opening in the embankment for the water to flow on and escape, was alleged in the declaration. A demurrer was sustained to the declaration." For error in sustaining such demurrer the judgment was reversed. These citations seem to establish quite satisfactorily the proposition that the defendant is liable for whatever damage results from a failure on its part to exercise proper care in the construction of its embankment. There was no evidence as to whether or not the embankment was the safest means by which the railroad company could have crossed that part of the bottom land over which its embankment was made, having reference solely to the construction and operation of its line of railroad. In the absence of any proof on that subject it is, perhaps, not going too far to assume that the railroad com--

pany, in so far as concerns its safety and efficiency in the operation of its line of railroad, adopted the most approved course in constructing this embankment. As to its liability for injury which that course is alleged to have caused, the question in this case arises. Before the action was begun the statute of limitations had barred any right to recovery which plaintiff might have had for injuries directly resulting from the proper construction of the defendant's embankment. This eliminates that class of questions from our consideration. (See *Carriger v. East Tennessee V. & G. R. Co.*, 7 Lea [Tenn.], 388; *Omaha & R. V. R. Co. v. Moschel*, 38 Neb., 281.)

The questions left for our inquiry are: First, was the water which was diverted by the embankment mere surface water as assumed in the third, fourth, and fifth instructions of the court above quoted? And, second, had the railroad company the right, if required by the proper construction and operation of its road, to divert such water into Yankee creek without liability for the consequent increase in flowage on plaintiff's land across said creek?

1. Under the first of these propositions let us consider the cases cited by plaintiff.

In *Crawford v. Rambo*, 44 O. St., on page 282, the court said: "It is difficult to see upon what principle the flood waters of a river can be likened to surface water. When it is said that a river is out of its banks no more is implied than that its volume then exceeds what it ordinarily is. Whether high or low, the entire volume at any one time constitutes the water of the river at such time, and the land over which its current flows must be regarded as its channel, so that when swollen by rains and melting snows it extends and flows over the bottoms along its course, that is its flood channel, as when by droughts it is reduced to its minimum, that is its low water channel. Surface water is that which is diffused over the surface of the ground, derived from falling rains or melting snows, and continues to

be such until it reaches some well defined channel in which it is accustomed to and does flow with other waters, whether derived from the surface or springs, and it then becomes the running water of a stream, and ceases to be surface water."

In *Byrne v. Minneapolis & St. L. R. Co.*, 38 Minn., on page 214, Dickinson, J., delivering the opinion of the court, said: "When in times of ordinary high water the stream extending beyond its banks, is accustomed to flow down over the adjacent low lands in a broader but still definable stream, it has still the character of a water-course, and the law relating to water-courses is applicable rather than that relating to mere surface water. (*Crawford v. Rambo*, 44 O. St., 279.)"

*O'Connell v. East Tennessee V. & G. R. Co.*, on page 449 of American Railroad and Corporation Reports, annotated, vol. 4, seems quite strongly to countenance plaintiff's contention. Lumpkin, J., delivering the opinion of the supreme court of Georgia in this case, uses the following language: "Thus it is material to consider whether the overflow as above stated is properly classed with surface water. This depends upon the configuration of the country and the relative position of the water after it has gone beyond the usual channel. If the flood water becomes severed from the main current or leaves the stream never to return, and spreads out over the lower ground, it has become surface water; but if it forms a continuous body, with the water flowing in the ordinary channel, or if it departs from such channel *animo revertendi*, presently to return, as by the recession of the waters, it is to be regarded as still a part of the river. The identity of a river does not depend upon the volume of water which may happen to flow down its course at any particular season. The authorities hold that a stream may be wholly dry at times without losing the character of a water-course. So, on the other hand, it may have a 'flood channel,' to retain the surplus waters until they can be discharged by the

natural flow.   The low places on a river act as natural
safety valves in times of freshet; and the defendant claims
the right to stop up one of these without liability for ensu-
ing damage."   The last sentence quoted comprehensively
states the subject of contention in that case.   Throughout
its entire discussion the distinction above stated is observed
and enforced by the citation of numerous adjudications.
It was not argued that the same result would follow if the
water should be properly classified as mere surface water
that would follow under the circumstances above indicated.
The opinion is quite lengthy, and very ably considered.  It
is introduced with the following statement of the proposi-
tions under consideration: " The precise question in this
case is, whether the owner of land on the bank of a river
can, without liability, erect on his own land an embank-
ment which increases the overflow in times of flood upon
the lands of the opposite proprietor to the injury thereof;
or is there any duty for each owner to receive upon his
land the share allotted it by nature of the flood waters
of the river?   It is contended by defendant's counsel that
the overflow from a river in time of flood or freshet is sur-
face water, against which, by the common law, a man
might protect himself, without regard to the consequences
to his neighbor.   Many cases cited by him make a dis-
tinction between the common law and the civil law as to
surface water, the former allowing the land-owner to dis-
pose of it in any way, the latter restraining him from so
using it as to injure his neighbor's tenement.   There is
authority to show that there is no difference between the
common and the civil law in this respect, but that the
common follows the civil law. (*Gillham v. Madison County
R. Co.*, 49 Ill., 484; *Gormley v. Sanford*, 52 Ill., 158, and
the able opinion in *Boyd v. Conklin*, 54 Mich., 583.)"

From the line of argument pursued in the above cases
cited by plaintiff, it would seem that the mooted question
is not so much as to the principles properly applicable to

surface water as to the difficulty of defining what is sur-
face water. The defendant has cited several cases which
we will now consider, for it is believed that from them it
will also appear that the difficulty is not so much as to the
law applicable to surface water as in defining that term.

In *Morrison v. Bucksport & B. R. Co.*, 67 Me., on page
356, occurs the following language: "But there must be
a boundary to this proprietary right somewhere. There-
fore it is that the principle is limited to the control of sur-
face water and cannot be extended to a water-course or
brook. A water-course cannot be stopped up or diverted
to the injury of other proprietors. There is a public or
natural easement in such a stream belonging to all persons
whose lands are benefited by it. The two things, surface
water and water-course, however, are not to be confounded.
To constitute a water-course it must appear that the water
usually flows in a particular direction and by a regular
channel, having a bed with banks and sides and (usually)
discharging itself into some other body or stream of water.
It may sometimes be dry. It need not flow continuously,
but it must have a well defined and substantial existence.
It is contended in some cases that there may be an excep-
tion to this description of a water-course in the case of
gorges or narrow passages in hills or mountainous regions;
but there is a broad distinction between a stream or a brook
constituting a water-course, and occasional and temporary
outbursts of water occasioned by unusual rains or the melt-
ing of snows flowing over the entire face of the tract of
land and filling up low and marshy places and running
over adjoining lands and into hollows and ravines which
are in ordinary seasons destitute of water and dry. (*Luther
v. Winnisimmet Co.*, 9 Cush. [Mass.], 171; *Ashley v. Wol-
cott*, 11 Cush. [Mass.], 192–195; *Hoyt v. City of Hudson*,
27 Wis., 656; *Bowlsby v. Speer*, 31 N. J. Law, 351;
Angell, Water Courses, sec. 1, *et seq.*; Wash., Easements,
c. 3, sec. 1, *et passim.*)"

In *Taylor, Admr., v. Fickas,* 64 Ind., on page 172, is the following discussion of this subject: "The property in water that passes along and through a water-course which has a bed, channel, and banks, where it usually flows, is a mere usufruct interest, continuing only while the water is passing over the lands of the owner.    He has the right to receive it where the water-course, in its natural channel, enters his land and to use it while it is passing over his lands, but he is required to return it to its channel when it leaves his land. (2 Bouvier, Law Dic., p. 66; Angell, Water Courses, secs. 94, 135.)    The property in the lost water that percolates the soil below the surface of the earth in hidden recesses without known channel or course, and property in the wild water that lies upon the surface of the earth or temporarily flows over it as the natural or artificial elevations or depressions may guide or invite it, but without a channel, and which may be caused by the falling of rain or the melting of snow and ice, or the rising of contiguous streams or rivers, fall within the maxim that a man's land extends to the center of the earth below the surface and to the skies above, and are absolute in the owner of the lands as being a part of the land itself."

A water-course is thus authoritatively considered and defined by MAXWELL, J., in *Pyle v. Richards,* 17 Neb., 180: "The testimony tends to show the following facts: That the lands of the plaintiff and defendant are south of the Nemaha river, in Richardson county, and that the Atchison & Nebraska railway runs nearly on the line between their respective tracts of land; that the plaintiff's land is south of and higher than that of the defendant; that one or more ravines extend some distance above the plaintiff's land, in which are certain springs, from which during a great portion of the year flows a small stream.    As stated by one witness, 'in very dry weather once in a while it went dry or partially so.    Down at the road it sinks a great deal of the time.    In wet weather it runs all of the time.'    The

natural course of the stream is northeast through the
plaintiff's land. The plaintiff built a dam across this
water-course and made a new channel for the stream run-
ning north, so that its waters were discharged against the
railroad, thence through what is designated in the testimony
as the west culvert on the lands of the defendant. The
testimony also tends to show that a large amount of sur-
face water from melting snows or heavy rains also flows
through said water-course. To constitute a water-course
the size of the stream is immaterial. It must be a stream
in fact as distinguished from mere surface drainage occa-
sioned by freshets or other extraordinary causes, but the
flow of water need not be constant. (*Shields v. Arndt*, 3
Green Ch. [N. J.], 234; *Gillette v. Johnson*, 30 Conn., 180;
*Bassett v. Mfg. Co.*, 43 N. H., 569; *Dudden v. Guardians*,
38 Eng. Law & Eq., 526.) In *Shields v. Arndt* it is
said : ' There must be water as well as land, and it must
be a stream usually flowing in a particular direction. It
need not flow continually, as many streams in this country
are at times dry.' When water has a definite source, as a
spring, and takes a defined channel, it is a water-course,
and no person through whose land it flows has a right to
divert it from its natural channel so as to cause injury to
another land-owner by the diversion."

The evidence in the case under consideration fails to
show that the water complained of was a part of Yankee
creek before crossing the right of way now occupied by the
defendant's embankment, though there is evidence from
which it might be inferred. It seems, too, that it was ulti-
mately discharged into the Nemaha river independently of
Yankee creek. It therefore seems not to have had an out-
let by a water-course within the definition given by MAX-
WELL, J., in *Pyle v. Richardson, supra*. It does not sat-
isfactorily appear from the evidence that it was a part of
the flood water of Yankee creek; neither is it shown that
but for the railroad embankment it would have sought an

Morrissey v. Chicago, B. & Q. R. Co.

outlet by way of that creek.   This water, therefore, under any of the definitions above given, was but surface water, and any interference therewith must be governed by the law applicable to water of that description.

2. As the distinction between the civil and common law referred to in the instructions of the court is rather curious than necessary, it will not be analyzed or historically considered.   The law of surface water had not received the attention of the courts of this country at the time some of the decisions cited were made, which has since been devoted to that subject.   It is therefore more profitable to consider rather what is now the recognized law of the country than what was the common law as enunciated by the courts of England.

The first instruction given by the court stated the law as follows : " That upon the boundaries of his own land not interfering with any natural or prescriptive watercourse the owner may erect such barriers as he may deem necessary to keep off surface water or overflowing floods coming from or across the adjacent lands, and for any consequent repulsion, turning aside, or heaping up of these waters to the injury of other lands he will not be responsible; but such waters as fall in rain and snow upon his land, or come thereon by surface drainage from or over contiguous lands, he must keep within his boundaries, or permit them to flow off without artificial interference, unless within the limits of his own land he can turn them into a natural water-course, which he has the right to do."·   In the latter part of this instruction it is barely possible that the court may have erred as against the defendant, in holding that it was the affirmative duty of the proprietor to keep within his boundary, or permit to flow off without interference, such waters as fall in rain or snow on his land or come there by surface drainage, unless within the limits of his own land he can turn them into a natural water-course.   It is unnecessary to determine this question,

though it may not be amiss to remark that we know
of no law which would require a proprietor to keep within
his boundaries water of the description last referred to in
this instruction.    In no event would he be required to do
more than permit the water to take its natural course.    He
would not be compellable to take affirmative action that it
might be prevented from flowing over the lands of some
other proprietor.    But this part of the instruction is not
material in this inquiry.    Whether or not the statement of
the law outside of that just criticised is correct, is the ques-
tion with which we have now to deal.  · Out of the abun-
dance of caution it is perhaps safe to premise that there has
been held a clear distinction between the rights of a ripa-
rian owner as to the flow of a stream, and rights as to mere
surface water; and furthermore, that it has been held that
the rights of lot-owners in cities are not regulated by the
same rules as obtain in respect of the subject-matter under
consideration.    The rights and liabilities of urban proprie-
tors as affected by the flow of water in any way, as well as
the rights of meddlers with the flow of water within water-
courses, are, therefore, expressly excluded from considera-
tion—still more from adjudication—in this case.

In *Gannon v. Hargadon*, 10 Allen [Mass.], 106, the
court said : " The obstruction of surface water or an alter-
ation in the flow of it affords no cause of action in behalf
of a person who may suffer loss or detriment therefrom,
against one who does no act inconsistent with the due exer-
cise of dominion over his own soil.    *    *    *    A party
may improve any portion of his land, although he may
thereby cause the surface water flowing thereon, whence-
soever it may come, to pass off in a different direction
and in larger quantities than previously.    If such act causes
damages to adjacent land, it is *damnum absque injuria.*"

The following language was used in *Chadeayne v. Rob-
inson*, 55 Conn., on page 350 : " The general common law
rule in reference to surface water is that stated in Gould on

Waters, section 267, as follows : ' The right of the owner of land to occupy and improve it in such manner and for such purposes as he may see fit, either by changing the surface or the erection of buildings or other structures thereon, is not restricted or modified by the fact that his own land is so situated with reference to that of adjoining owners that an alteration in the mode of its improvement or occupation in any portion of it will cause water which may accumulate thereon by rains and snows falling on its surface, or flowing onto it over the surface of adjacent lots, either to stand in unusual quantities on other adjacent lands, or pass into and over the same in greater quantities or in other directions than they were accustomed to flow.'"

In *Cairo & V. R. Co. v. Stevens,* 73 Ind., on page 281, this language occurs : " Dillon in his work on Municipal Corporations, speaking of the surface water, says: ' This the law very largely regards (as Lord Tenterden phrases it) as a common enemy which every proprietor may fight or get rid of as best he may. * * * On the one hand, the owner of the property may take such measures as he deems expedient to keep the surface water off from him or turn it away from his premises onto the street; and on the other hand, the municipal authorities may exercise their powers in respect to the graduation, improvement, and repair of streets without being liable for the consequential damages caused by surface water to adjacent property.'"

In *Morrison v. Bucksport & B. R. Co.,* 67 Me., on page 355 *et seq.,* the following language occurs : " It is a fundamental maxim of the law that a man may use his own land for lawful purposes as he pleases. He may make erections or excavations thereon to any extent whatever. Within his own limits he can control not only the face of the earth, but everything under it and over it. Thereby the estate of another man may be injuriously affected, much loss and hardship even might grow out of it, but it is not a legal injury and there is no legal remedy for it. Such results are

necessarily incident to the ownership of land.  \*  \*  \*
Among other results from the application of this principle,
it is well established that any proprietor of land may con-
trol the flow of mere surface water over his own premises
according to his own wants and interests without obliga-
tion to any proprietor either above or below.   There may
not be an entire coincidence of view in the cases in this
country as to the extent of the right of the upper proprie-
tor in this respect, but in all the cases the principle is ad-
mitted.   He may prevent surface water from coming upon
his land according to its accustomed flow, whether flowing
thereon from the highway or any adjoining land.  (*Bangor
v. Lansil*, 51 Me., 521.)  He may prevent its passing from
his land in its natural flow.  (*Gannon v. Hargadon*, 10
Allen [Mass.], 106.)  It was said in *Rawstron v. Taylor*,
11 Exch. [Eng.], 369, that one party cannot insist upon
another maintaining his field as a mere water-table for the
other's benefit.   He may erect structures upon his own
land as high as he pleases, without regard to its effect upon
surface water, no matter how much others are disturbed by
it.  (*Flagg v. Worcester*, 13 Gray [Mass.], 601 ; *Bates v.
Smith*, 100 Mass., 181, 182.)  And he may dig ever so deep
upon his own land for proper purposes, although he thereby
deprives his neighbor of the sources of water.  (*Chase v.
Silverstone*, 62 Me., 175.)  If all this were not so, men
could not reconstruct and utilize their landed estates with-
out infinite trouble and suits.   But there must be a bound-
ary to this proprietary right somewhere.   Therefore, it is
that the principle is limited to the control of surface water
and cannot be extended to a water-course or brook."

In *Bowlsby v. Speer*, 31 N. J. Law, 351, is the follow-
ing language: "The owner of land may at his pleasure with-
hold the water falling on his property from passing in its
natural course onto that of his neighbor, and in the same
manner may prevent the water falling on the land of the
latter from coming onto his own.   In a word, neither the

right to discharge nor to receive the surface water can have any legal existence except from a grant, express or implied. The wisdom of this doctrine will be apparent to all minds upon very little reflection. If the right to run in its natural channels was annexed to surface water as a legal incident, the difficulties would be infinite indeed. Unless the land should be left idle, it would be impossible to enforce the right in its rigor; for it is obvious every house that is built and every furrow that is made in the field is a disturbance of such right. If such a doctrine prevailed every acclivity would be and remain a water-shed, and most low ground become reservoirs. It is certain that any other doctrine but that which the law has adopted would be altogether impracticable. This subject, until a comparatively recent date, does not appear to have received the attention of the courts. No ancient authority can, therefore, be produced, but the topic has of late been discussed both by the barons of the exchequer and by the courts of Massachusetts, and the doctrine placed upon a footing which, as it seems to me, should receive the assent of all persons. Upon an examination of these cases it will be found that the conclusion is reached that no right of any kind can be claimed in the mere flow of surface water, and that neither its retention, diversion, repulsion, or altered transmission is an actionable injury, even though damage ensues."

The supreme court of Kansas in *Chicago, K. & N. R. Co. v. Steck*, 33 Pac. Rep., on page 602, employed the following language: "It is well settled that as a general rule the doctrine of the common law with respect to the obstruction and flow of surface water prevails in Kansas. (*Kansas City & E. R. Co. v. Riley*, 33 Kan., 374, 6 Pac. Rep., 581.) Under that doctrine an adjoining owner may not without liability obstruct the flow of water through a natural water-course; but to constitute such a water-course 'there must be a channel, a bed to the stream, and not merely low land or a depression in the prairie

over which water flows. It matters not what the width or depth may be. A water-course implies a distinct channel; a way cut and kept open by running water; a passage whose appearance, different from that of the adjacent land, discloses to every eye on a mere casual glance the bed of a constant or frequent stream.' (*Gibbs v. Williams*, 25 Kan., 214.) It has also been held that the mere 'fact that the owner of one tract of land raises an embankment upon it which prevents the surface waters falling and running upon the land of an adjoining owner from running off said land, and causes it to accumulate thereon to its damage, gives to the latter no cause of action against the former.'"

In *Kansas City & E. R. Co. v. Riley*, 20 Am. & Eng. R. R. Cases, 116, a Kansas case, it was held that a railroad company was not liable in damages for obstructing the flow of surface water from its natural course by the construction of an embankment when there was no channel or water-course containing living or running water obstructed.

In *Brown v. Winona & S. W. R. Co.*, 55 N. W. Rep., 123, the supreme court of Minnesota, having first excused the mistake in his understanding of the law, made by the trial judge, resulting from the loose, inartistic statements as to the subject under discussion formerly employed by that appellate court, thus stated its views: "For the sake of precision we will restate the question: When an owner improves his land for the purpose for which such land is ordinarily used, doing only what is necessary for that purpose, and being guilty of no negligence in the manner of doing it, is he liable because, as an incident of so improving, surface waters accumulate and flow in a stream upon the lands of others? A doubt upon this was suggested in the O'Brien case, but on more mature consideration we are of opinion that the owner so improving is not liable. The rule stated in that case has frequently been quoted in other cases in this court, and its correctness has never been questioned; and but for the doubt suggested in that case, we do

not think it would have been questioned that a case like
this comes within it.    One's land may be incidentally, even
seriously, injured in value and usefulness by the proper
improving of adjacent land, withdrawing from it surface
waters, the presence of which may improve its fertility
and value, or shedding upon it surface waters which
would not otherwise go there and drowning it or other-
wise impairing its value, or causing such waters to remain
upon it, although their presence may render it compara-
tively valueless, and no action will lie.    When the injury is
incidental to the proper improving of adjacent land, it is
impossible to see that the manner in which such improve-
ment operates to cause the injury, whether by drawing off
the waters or setting them back so that they cannot flow
off, or causing them to run either in a diffused manner or
in streams, can make any difference with the liability.    If
a man's lands be injured to the extent of $500 by sur-
face water coming upon it, it would seem illogical and un-
reasonable that he may recover if it come in streams, but
cannot recover if it come in a diffused manner.    The test
of liability must be: is the injury incidental to another
man doing on his own land what he has a right to do;
*i. e.*, improve it for the purpose for which such land is
ordinarily used, doing what is necessary for that purpose?
It must, however, be understood that one cannot improve
his own land by merely transferring waters which would
naturally rest upon it to the land of another."

In Missouri there has been some contrariety of opinion,
but the law of that state on this subject is now settled, as
shown from the following quotation from *Abbott v. Kansas
City, St. J. & C. B. R. Co.*, 20 Am. & Eng. R. R. Cases, pp.
110 *et seq.:* "In the recent case of *Benson v. Chicago & A.
R. Co.*, 78 Mo., 504–512, s. c. *supra*, this court, speaking
through Philips, C., practically reaffirms the common law
doctrine of the earlier decisions of this court in respect to
surface water.    After referring to natural water-courses,

this language is used : 'But as to the right of a dominant proprietor to divert mere surface water and turn its flow upon his neighbor, there is much conflict and confusion. Each case must in large measures depend on its own peculiar facts. The general rule, it is true, applicable to the enjoyment of real estate is expressed in the maxim, *cujus est solum, ejus est usque ad cœlum.* He has, ordinarily, the right to use and improve his real estate by protecting it against water flowing over its surface. In doing so the dominant proprietor may turn it from his land onto the servient or lower land, without liability to damage. Mere surface water, that which does not run in any defined course or confined channel, is regarded as a common enemy against which any land-owner affected by it may fight.' " After referring to the opinions which had been delivered in two Missouri cases, Ray, J., delivering the opinion of the court, continued as follows : " With all due respect for the acknowledged ability of the distinguished jurist who wrote those opinions, we feel constrained to recognize the common law doctrine on this subject, so often and repeatedly approved by this court without division in all its earlier and later decisions, as still the law in this state. The rule of the common law as expounded in the numerous decisions quoted above we think, after all, best promotes and conserves the varied and important interests of both the public and private individuals incident to and growing out of this question. It permits and encourages public and private improvements, and at the same time restrains those engaged in such enterprises from unnecessarily or carelessly injuring another. It may be added, in this connection, that whatever change may have been made in the common law duties and obligations of railroad companies in this particular by sec. 810, Rev. St., 1879, 140, does not arise, and is immaterial in this case, since the suit is not brought for a failure to construct the ditches and drains along the sides of the road-bed required by that act.

but for a failure to provide water-ways or culverts across the road-bed or through its embankments so as to allow the surface water to pass off in that direction. A strict and literal application of the doctrine of the civil law would, we think, in many places and in large districts of country, materially retard, if not utterly destroy, many useful and profitable improvements, pursuits, and enterprises besides railroading. (*Sowers v. Shiff*, 15 La. Ann., 300; *Martin v. Jett*, 12 La., 503.) Numerous decisions in various other states also adopt and adhere to the common law as to surface water to the same extent as do the adjudications in this state. (13 Allen, 293; 27 Wis., 656; 25 Wis., 223; 31 N. J. Law [2 Vroom], 351; 50 N. H., 439; 58 Barb. [N. Y.], 413; 73 Ind., 278; and 24 Albany Law Journal, 453.)"

In the case of *Moyer v. New York C. & H. R. R. Co.*, 88 N. Y., 355, it was held that a railroad corporation was not liable for damages to any person by reason of the overflow of water of a stream caused by the necessary elevation of its road-bed not in the channel of the stream but upon its own land.

The supreme court of South Carolina, with reference to the general subject under consideration as affected by a statutory provision like that found in section 1, chapter 15, Compiled Statutes, made use of the following language in *Edwards v. Charlotte, C. & A. R. Co.*, 18 S. E. Rep., 58: "In view of the express declaration of the law-making power, as embodied in section 2734 of the General Statutes, we feel bound to declare, in the absence of any constitutional provision, statute, or even authoritative decision to the contrary, that the common law rule must still be recognized as controlling here, for that section expressly declares that 'every part of the common law of England, not altered by this act nor inconsistent with the constitution of this state, and the customs and laws thereof, is hereby continued in full force and virtue within this state

in the same manner as before the passage of this act." Under the common law rule, surface water is regarded as a common enemy, and every landed proprietor has a right to take any measures necessary to the protection of his own property from its ravages, even if in doing so he throws it back upon a coterminous proprietor, to his damage, which the law regards as a case of *damnum absque injuria*, and affording no cause of action. This rule was applied in a case very much like the present, *Rowe v. St. Paul, M. & M. R. Co.*, 41 Minn., 384, 43 N. W. Rep. [Minn.], 76; also in *Cairo & V. R. Co. v. Stevens*, 73 Ind., 278; *O'Connor v. Fon du Lac, A. & P. R. Co.*, 52 Wis., 526, 9 N. W. Rep. [Wis.], 287; *Johnson v. Chicago, St. P., M. & O. R. Co.*, 80 Wis., 641, 50 N. W. Rep. [Wis.], 771. See also *Chadeayne v. Robinson*, 55 Conn., 345, 11 Atl. Rep. [Conn.], 592, and *Abbott v. Kansas City, St. J. & C. B. R. Co.*, 83 Mo., 271, in which the case of *Shane v. Kansas City, St. J. & C. B. R. Co.*, 71 Mo., 237, relied upon by appellant, as well as the case of *McCormick v. Kansas City, St. J. & C. B. R. Co.*, 70 Mo., 359, are commented on and practically overruled, so far as the question now under consideration is concerned."

As indicated in some of the quotations above made, there are some states where, perhaps, the civil law or its analogies have been followed, in which the consensus of the above opinions is not approved. Whether influenced by the sources of their inspiration or not, these decisions are clearly in the minority, and we believe are not supported by the better course of reasoning.

Our conclusions are, that the district court correctly concluded from all the evidence adduced on the trial of this case that the water, the flow of which was interfered with by the railroad embankment, was surface water. It flowed in no defined water-course and overflowed only when there were extraordinary freshets. It was not shown that in its undiverted course it originated from or returned to the

channel of Yankee creek. Its existence was directly traceable to falling rains. Its course was along the valley, but not as a part of the stream. The railroad company, in the absence of evidence to the contrary, must be presumed to have constructed its embankment in a manner proper for the operation of its line of railway. If in doing so, surface water was deflected from its course so as to be thrown across Yankee creek and over the land of the plaintiff, no right of action thereby accrued to plaintiff, even though at great expense, by erecting trestle work instead of such embankment, or by piercing the embankment with culverts, which by the discharge of water must of necessity injure other property, the damage to plaintiff might have been avoided or greatly lessened. So far as at all necessary for consideration, the instructions of the court recognized and enforced the principles above stated. It results, therefore, that the judgment of the district court is

AFFIRMED.

MAXWELL, C. J., dissenting.* (December 29, 1893.)

From the statement of the case in the opinion of Commissioner Ryan it seems to me there is vital error in the decision. The constitution of Nebraska requires just compensation to be made to the owner of property taken or *damaged* for public use. The right to take is unquestioned where there is a necessity for the same, but this right is attended with the correlative one, that compensation must be made to the owner. The theory of the law is that the landowner shall be compensated in money for all direct injuries to the land resulting from the taking, unless the incidental damages are diminished by special benefits. These damages are to be computed upon the basis of the proper construction of the railway. (*Fremont, E. & M. V. R. Co. v. Whalen,*

---

* The opinion in this case, at the time it was filed, was concurred in by all members of the court. Subsequently the chief justice furnished the reporter the above dissenting opinion.

11 Neb., 585.) In the case at bar there were no culverts in the embankment to permit the water to flow in its accustomed course toward the Nemaha river. Had there been, the damage in this case would not have occurred. This, in my view, was actionable negligence on the part of the company.

The case seems to be decided upon the theory that the railroad company has the right to exclude the water from its own land; but the statement shows that in fact the company diverted the water, turned it into artificial channels, and caused it to empty into Yankee creek, and thereby caused it to overflow and spread over the plaintiff's land and destroy his crops. Upon what theory can this be justified? Certainly not upon the ground that it was surface water. In *Fremont, E. & M. V. R. Co. v. Marley*, 25 Neb., 138, this court held that the railroad company had no right to collect surface water in a ditch or drain and permit it to flow upon the land of another without his consent; and the same rule applies to the case at bar. There is no analogy between the case of the owner of land excluding surface water from his premises and that of a railroad company. In the one case, the land-owner merely prevents the water from flowing onto his land; in the other, in the absence of culverts or bridges, a continuous barrier is presented to the flow of water which would thus be dammed upon the land above or thrown in a body upon the land below, in either case causing injury and loss. The projectors of a railway locate a line across a farm on which the surface water has theretofore had a free outlet, so that no injury has resulted from the backing up of the water or from it being collected and thrown in a body upon that farm or the lands below. In constructing the road, however, a solid embankment is made, by which the flow of water is obstructed and thrown in a body upon another part of the same farm or the lands of an adjoining land-owner, by means of which his crops are destroyed, and we

are gravely told that the corporation has a right to do this. In *Boyd v. Conklin*, 20 N. W. Rep., 595, the supreme court of Michigan held that where surface water had been allowed to flow in a certain direction for more than twenty years, an easement was acquired by prescription. This opinion was approved in *Gregory v. Bush*, 31 N. W. Rep. [Mich.], 92. In no event can a party, by artificial drains or ditches, collect the surface waters and cast them in a body upon the proprietor below without being liable for the injury. (*Livingston v. McDonald*, 21 Ia., 160; *Butler v. Peck*, 16 O. St., 334; *Martin v. Riddle*, 26 Pa. St., 415; *Pettigrew v. Evansville*, 25 Wis., 223; *Gregory v. Bush*, 31 N. W. Rep. [Mich], 92.) It is very clear to my mind that the railway company must provide sufficient openings in its road to permit the flow of surface water in its accustomed course and not cast it in a body upon the proprietor below. That system is best which, while protecting the railway company in its just rights, requires it to deal fairly with the persons across whose lands the road is constructed, in order that the public improvement shall not be the means of impoverishing any one. It is very evident that the court below erred in its instructions, and the judgment should be reversed and the cause remanded for a new trial.