TIMOTHY MURPHY, APPELLEE, v. CHICAGO, BURLINGTON &
QUINCY RAILROAD COMPANY, APPELLANT.

FILED MARCH 31, 1917. No. 19083.

1. **Waters:** OBSTRUCTION OF STREAM: LIABILITY. Overflow waters of
a stream which have spread over the adjoining country, whence
they disappear only by evaporation or percolation, may be defended
against as surface waters, but overflow waters which flow in an
accustomed course through a depression into the same stream at
a lower point in its course or into another stream or lake, though
they do not flow in a channel with well-defined banks, do not be-
come surface waters, and if their accustomed course is negligently
obstructed by a railroad embankment, the railroad company is lia-
ble for damages to crops caused by the waters so retained.

2. ———: ———: DAMAGES. If, however, some damage would have
occurred, even if the railroad embankment had not been built, the
company would only be liable for such damages in addition thereto
as were caused by the damming or obstruction of the waters to a
greater height or for a longer time than would otherwise have
occurred.

APPEAL from the district court for Dakota county: GUY
T. GRAVES, JUDGE. *Reversed.*

*Byron Clark, Jesse L. Root* and *J. W. Weingarten,* for
appellant.

*R. E. Evans, contra.*

LETTON, J.

This is an action to recover damages for the destruction of
and injury to hay, grain and growing crops by flooding, al-
leged to have been caused by the negligent construction of
defendant's bridges and roadbed.

The petition, in substance, alleges that in the locality
where the damage was done Omaha creek ran northerly,
then easterly, then southeasterly into the Missouri river;
that the creek is subject to heavy floods; that its banks
close to the channel on the west are higher than at a dis-
tance from the same; that the railroad crosses Omaha

creek twice in the village of Homer, and that in the bridg-
ing of the creek the defendant negligently constructed the
bridges by using piles so as to obstruct the flow of the wa-
ter in the channel and catch and hold debris; that the wa-
ter which would otherwise flow through the channels over-
flow on the west side of the railway, and flows down over
and across land which is farmed by the plaintiff and his as-
signors, that the waters of Elk Creek, a stream flowing
from the north, flow into Omaha creek about a mile and a
half north of the bridges; that at the junction of these
creeks in times of high water the banks of the stream are
frequently overflowed. It is also alleged that there is a
well-defined slough or channel or way through which the
flood waters formerly rapidly flowed off to the east and
southeast; that defendant negligently constructed a rail-
road embankment about four feet high across said flood-
water channel and failed to provide sufficient means by
which the flood waters could seek their natural outlet to-
ward the Missouri river, into which the waters of Omaha
creek naturally flow; that on August 16, 1912, there was
a flood in said creeks, by reason of which and of said bridges
so negligently constructed flood waters were thrown out
of the channel and held upon the land of plaintiff by the
railroad embankment to the damage of his crops, specify-
ing the items. There are six other causes of action alleged
for damage to crops upon other tracts of land either owned
by the plaintiff or owned by others who have assigned their
right of action to him.

The answer admits the construction of the railway, and
that there was high water at the time stated, denies the
facts alleged as to the crops, pleads that the overflow was
the result of natural causes and of obstructions created by
the construction of public highway bridges across Omaha
creek. The case was tried without the intervention of a
jury. The court found that the defendant was negligent
in the construction of the embankment and bridges thereby
causing the flood waters to flow across the lands described
in the petition, retarding the flow therefrom, and destroy-

ing  crops to plaintiff's damage in the sum of $3,026.80, for which sum judgment was rendered.

The flooded land lies upon what is known as the Missouri river bottoms. At this point Omaha creek, which drains a large territory, flows northward at a distance of about half a mile east from the line of the bluffs which form the western edge of the river valley. A short distance to the west of the stream there is a low ridge, so that a depression is formed between the bluffs and this ridge extending from near the railroad bridges about as far as the junction of Omaha and Elk creeks. The village of Homer lies near the south end of this depression. The line of railway crosses a loop or bend of Omaha creek in or a little south of the village of Homer by two bridges, both of which cross the creek somewhat diagonally. There is some evidence tending to prove that the northern of these two bridges obstructed the water of the stream, but, since the water passing through this bridge flowed from the east side of the embankment to the west side, this could not cause the flood on the west side of the railroad or cause the flood waters on the west side to flow northward through the depression mentioned to the land in section 2, described in the fifth cause of action.

The evidence is not disputed that before the railway was built the flood waters of Omaha creek, augmented by those of the tributary south of Homer known as Fiddler creek, in times of flood followed this depression. Plaintiff contends that the bridges by the obstruction they created on account of piling in the channel and insufficient openings caused the flood within this channel and over the other lands. We are convinced, however, from an examination of all the  evidence that the waters were so high that, even if the bridge and railroad had not existed,  they would still have followed the course through the streets of Homer and down the depression west of the stream, and we find the evidence insufficient to sustain the fifth cause of action.

The important question in the case seems to be whether defendant is liable for damages to crops on other lands un-

der the second ground of negligence alleged, to wit: the negligent construction of the railroad embankment across a natural depression to the east of Omaha creek, through which it is alleged overflow waters from both Omaha and Elk creeks had been accustomed to flow. At the time of the flood the water was three feet deep on the west side of the track and the land was dry on the east side. Testimony in behalf of plaintiff showed that before the construction of the railroad Omaha creek and Elk creek had overflowed at least four or five times in twenty-five years. Flood water coming from the stream some distance south of the junction flowed southeasterly for several miles to the old Blyburg lake bed; another overflow, farther north, ran northeasterly and again entered Omaha creek near the railroad bridge in section one. The water which ran to the lake did not flow in a channel with well defined banks, but followed a wide and shallow depression in the nearly level land. It varied in width from a few rods where it left the stream to a half mile, farther southeast, and in depth from a few inches at the edges to three feet. The evidence does not show how wide the depression is where the railroad obstructs it or how high the water was before it would flow into the lake, but it is shown that the water would run off the land of Mr. Ashford and others of plaintiff's assignors within about 24 hours, doing practically no damage to growing corn. In the flood of August, 1912, the railroad embankment prevented the water from passing off to the southeast, and it was held on the lands for three, four and five days, in some places three feet deep. It did not pass off until the water in the creek subsided, when a considerable part drained into the creek through a borrow pit near the lower railroad bridge in section one.

Defendant contends that this water is surface water that it has a right to defend itself against, and that it is not liable for damages under the doctrine of *Morrissey v. Chicago, B. & Q. R. Co.,* 38 Neb. 406. It insists that, if it be held otherwise, in order to escape liability it will be compelled to build a trestle a half mile long to permit the free

flowage of water in times of such rather unusual floods, since it cannot construct openings in its embankment to permit these waters to pass through without becoming liable to owners of lower lands for collecting surface water and discharging it in a body upon their land.

Plaintiff's contention is that the waters are not surface water, but are flood waters of a stream. There is a conflict in the authorities upon this question, but as to flood waters which follow a well-defined course and return to the same stream at a lower point in its course the question has been settled for this state in the cases of *Chicago, B. & Q. R. Co. v. Emmert*, 53 Neb. 237, and *Brinegar v. Copass*, 77 Neb. 241. In the latter case it was said: "It is true that flood waters may become entirely separated from the stream and so have lost their identity with it. When it has spread over the adjoining country, settled in low places, and become stagnant, it can no longer be treated as a part of the stream, and the rules with respect to watercourses can then no longer be applied. But overflow waters from a natural stream in times of flood or freshet, flowing over or standing upon adjacent lowlands, do not cease to be part of the stream unless or until separated therefrom so as to prevent their return to its channel. 3 Farnham, Waters and Water Rights, sec. 879."

The evidence shows that the greater volume of the overflow waters would not return to Omaha creek at a lower point even had there been no embankment to obstruct their flow. These waters spread to some extent over the land east and southeast of their emergence from the creek, but did not remain there until lost by percolation or evaporation except in some small depressions. The testimony is not disputed that they found their outlet in the lake or lake bed about two miles to the southeast.

The question whether waters overflowing from a stream and following a slight natural depression, in a definite direction, and well-defined course, to an outlet in another stream or in a lake or lake bed, lose their character as flood waters and become, in contemplation of law, surface wa-

ters, which each landowner may dike against, is a new question in this state. In the *Morrissey* case the waters had never become part of a flowing stream. In the *Brinegar* case the waters were part of the stream, and after separation again returned to it. The basic principle which should determine the character of these waters seems to the writer to be the ancient maxim, *"Aqua currit et debet currere ut currere solebat."* Water runs and ought to run as it has used to run. Each owner of lands bordering upon either the normal or flood channels of a running stream is entitled to have its water, whether within its banks or in its flood channels, run as it has used to run, and no one has the right to interfere with its accustomed flow to the damage of another. The question has been considered in England. In *Rex v. Trafford,* 1 Barn. & Ad. (Eng.) *874, Lord Tenterden said: "Now, it has long been established that the ordinary course of water cannot be lawfully changed or obstructed for the benefit of one class of persons, to the injury of another. Unless, therefore, a sound distinction can be made between the ordinary course of water flowing in a bounded channel at all usual seasons, and the extraordinary course which its superabundant quantity has been accustomed to take at particular seasons, the creation and continuance of these fenders cannot be justified. No case was cited, or has been found, that will support such a distinction." See, also, dictum of the Lord Chancellor in *Menzies v. Breadalbane,* 3 Bligh (Eng.) n. s. 414, 418; *Lawrence v. Great N. R. Co.,* 16 Ad. & E. (Eng.) 643, 654.

In a Wisconsin case the facts were that the flood waters of the Wisconsin river flowed in an accustomed course into the Baraboo river, and that the defendant city caused a street or causeway to be built so as to obstruct this natural waterway. The court said: "In the case before us it is obvious that the waters which were obstructed were not surface waters. They were the waters of the Wisconsin river, which, in its usual high stages, were accustomed to flow across this bottom into the Baraboo river. The effect of the road obviously would be to dam these waters, and

proper and sufficient culverts should have been provided
for passing the waters through the embankment. But, be-
cause the road was negligently and unskilfully built, no
such provision was made for the flow of the waters in their
natural course. It seems to us the city was liable for dam-
ages accruing from the negligent and improper manner of
constructing the highway." *Spelman v. City of Portage,*
41 Wis. 144.

In *Jefferson v. Hicks,* 23 Okla. 684, 24 L. R. A. n. s. 214,
it was said: "The flood waters in the case at bar were accus-
tomed, before the erection of the levee, to break out of the
channel over the east bank of the stream at the place where
the levee is being maintained and to flow down through
the town site of Jefferson, and ultimately back into the
main channel, or into another watercourse south of the
levee. When the surface waters which fall upon the water-
shed of Pond creek ultimately gather and collect in the
channel of that stream, they lose their character as surface
water, and become the waters of a watercourse, and when
they overflow the bank opposite the town site, and pursue
a general course back into the same watercourse, or into
another watercourse, although they do not follow a chan-
nel with well-defined banks, they continue flood waters of
the watercourse, and do not become surface water." See,
also, *Lampley v. Atlantic C. L. R. Co.,* 63 S. Car. 462; *Mil-
ler v. Eastern Railway & Lumber Co.,* 84 Wash. 31.

In *Conn v. Chicago, B. & Q. R. Co.,* 88 Neb. 732, it is
said: "In the absence of a grant binding all persons af-
fected and to be affected thereby, this court does not recog-
nize the right of a railway company to obstruct the channel
of a natural watercourse or drain, but has said that a con-
tinuing duty is imposed upon the carrier to permit the wa-
ter to flow therein as it did in a state of nature, or to pro-
vide another adequate way therefor."

Mr. Gould says: "A stream does not cease to be a wa-
tercourse and become mere surface water because at a cer-
tain point it spreads over a level meadow several rods in
width, and flows for a distance without defined banks be-

fore flowing again in a definite channel." Gould, Waters (3d ed.) sec. 264.

In 3 Farnham, Waters and Water Rights, sec. 880, it is said: "Every stream flowing through a country subject to a changeable climate must have periods of high and low water. And it must have, not only its ordinary channel which carries the water in ordinary times, but it must have, also, its flood channel to accommodate the water when additional quantities find their way into the stream. The flood channel of the stream is as much a natural part of it as is the ordinary channel. It is provided by nature, and it is necessary to the safe discharge of the volume of water. With this flood channel no one is permitted to interfere to the injury of other riparian owners. When the water rises until it reaches the margin of this flood channel, and begins to flow over it, it may do so in natural vents or outlets which are a part of the stream, and with which there can be no individual interference to the injury of other persons, or it may spread out uniformly over a large section of country in small volume and with no definite course or ultimate destination, but which will gradually be lost by evaporation or percolation into the ground. The principles which prevent interference with the water when a part of the rushing torrent, or when finding its way by well-defined outlets from one stream to another, do not apply with equal force to the water when it is spread out over the face of the country in such a way as to have lost its power to maintain a continued flow. By keeping these forms distinct, and considering in every case to which of them a particular decision applies, most of the seeming conflict in the authorities disappears."

We conclude, therefore, that all damage caused to crops by the holding back of water which but for the embankment would have flowed in an accustomed course to the lake bed is a proper subject of recovery.

As to the fourth and sixth causes of action there is proof tending to show that the waters of Elk creek did not join the flood of Omaha creek until Sunday evening. In the

meantime the backwater caused by the railroad embankment had been flowing to the north of Omaha creek at and below the junction.  Plaintiff contends that the damages claimed under the fourth and sixth causes of action were due to the bridge in Homer, and to the construction of the railroad embankment across the channel of the flood waters of Omaha creek. So far as the evidence shows, the same amount of water would flow north to the junction of the two creeks and flow off to the southeast, if there were no obstruction at Homer, and, if no embankment lay to the eastward, it would not cross over Elk creek into section 35 and the north part of section 2 in quantities sufficient to harm crops. If the water flowed north of Elk creek in sections 2 and 35, in any volume, it was due to the embankment, and not to any obstruction by the bridges at Homer.

The first group of assignments of error is concerned with the manner of proving the value of the crops damaged or destroyed.  In several instances the witness, after having stated the value of the crop as it stood before the flood, was asked what in his opinion was the difference in the value of the crop just before the flood and after it had been injured.  The latter question was objected to as being improper and invading the province of the court.  The objection was overruled, and this and other like rulings are complained of.  Having fixed the value before the flood, and the witness having given the difference in value after the flood, the court had exactly the same facts before it as it would have had had the usual formula in jury trials been observed of asking what was the value before and what was the value after the flood and leaving the court to compute the difference.  We cannot see that the defendant has been prejudiced by these rulings.  Other testimony as to the value was received.  Taken together, the evidence is sufficient on this point.  However, we deem it advisable to call attention to the rules for proving the amount of damages to crops laid down in the cases of *Pribbeno v. Chicago, B. & Q. R. Co.*, 81 Neb. 657, and *Morse v. Chicago, B. & Q. R. Co.*, 81 Neb. 745, and cases cited in these opinions.

101 Neb.—6

Complaint is also made that, since plaintiff had con-
veyed his land to his daughters prior to the flood, he had
lost all title to the crops, and could not maintain such an
action unless his right to crops was reserved in the deed.
But both plaintiff and his grantees testified that the crops
were his for that year. A judgment in plaintiff's favor
based on such testimony would effectually estop his daugh-
ters from afterwards claiming as against defendant that
they owned the crop, and no prejudice can result on this
account.

The peculiar conditions of the locality with reference to
the course of drainage, the combination in one suit of seven
causes of action for damages occurring upon different
tracts of land, the manner in which the testimony was
given, the numerous maps and plats in evidence showing
ground and high water levels, and the lack of findings of
damages in each cause of action have made this a most diffi-
cult and perplexing case to determine. After repeated
reading and consideration of the record, we have reached
the conclusion that the injury to the crop upon part of the
land was occasioned by the retention of water several days
longer than would have occurred had the embankment not
been built, but the evidence is unsatisfactory as to what its
condition actually is, how many of the tracts were affected
by this condition, and as to the specific damages to crops
occurring upon each tract, and is insufficient to support
the general finding. It is also unsatisfactory as to wheth-
er the "Blyburg lake bed" is a mere shallow and ordinarily
dry depression in the surface of the land with no outlet, or
what its condition actually is. Upon another trial plain-
tiff may be able to supply sufficient proof, more especially
as to the land near the swamp north of the junction and
embraced in the first, fourth and sixth causes of action.
There seems to be no definite proof of the cause of damages
occurring to crops upon the Murphy land in section 36,
described in the second cause of action.

The judgment of the district court is reversed and the
cause remanded for further proceedings.

REVERSED.

SEDGWICK, J., concurring.

I think that the judgment of the trial court ought to. be reversed, but I do not concur in the principal statements and definitions in the opinion.

The first paragraph of the syllabus says: "Overflow waters of a stream which have spread over the adjoining country, whence they disappear only by evaporation or percolation, may be defended against as surface waters." The opinion shows beyond question that the water complained of is overflow waters of the stream, that they have spread out over the adjoining country and they disappear only by evaporation or percolation. If the statement of the law in the syllabus is correct, then they are surface waters.·

The principal question in the case seems to be whether the water complained of is surface water or is a stream of water as it was before it escaped from the principal watercourse. Surface water is a common enemy and may be defended against as such. A stream of water is a common friend and cannot be interfered with to the injury of others. To· distinguish between these two the law calls one surface water, and has adopted a technical name for the other which is a little unfortunate. It is called "flood water." Now, surface water is generally a flood of water as the term flood is commonly used and understood. The word "flood" is defined in Webster's New International Dictionary as: "A great flow of water; a body of moving water; * * * especially, a body of water rising, swelling, and overflowing land not usually thus covered."

It seems that the court and also the plaintiff in the trial of the case used the word "flood" indiscriminately, sometimes in its technical sense of "flood water," that is, a stream of water, and sometimes as expressing a volume of water. This led to a considerable confusion which it seems to me is perpetuated in the opinion of the court. In the briefs the plaintiff concedes that this water complained of is surface water. The brief states two propositions relied upon to support the judgment: One is that the defendant improperly constructed its bridges and crowded

the water out of the banks of the creek. The other is: "Where a railroad company in the construction of its railroad crosses a natural channel or waterway through which storm or surface waters have been accustomed to flow, it is negligence upon the part of the company to construct its embankment in such manner as to obstruct or dam the natural waterway and thereby occasion damage upon the lands of others."

The opinion says that the water complained of "varied in width from a few rods where it left the stream to a half mile, farther southeast." It "followed a wide and shallow depression in the nearly level land." It varies in depth "from a few inches at the edges to three feet. The petition speaks about this water finally, after two miles overflowing this country, entering into a lake, but the opinion shows that the petition does not mention any lake, but alleges that the waters seek their outlet "toward the Missouri river, into which the waters of Omaha creek naturally flow," without alleging that it ever reaches any river. Some of the witnesses speak of the depression where this water, after flowing over the country for about two miles, is finally absorbed or evaporated, and one or two witnesses called it "the old Blyburg lake bed," but none of them testifies that there is anything like a lake there. Evidently some of this water gets as far as that depression (if the overflow is sufficiently large, which seldom happens) and is absorbed. The trial court found "that the defendant was negligent in its construction of its embankment and its bridges over and across Omaha creek as alleged and set forth in plaintiff's petition, thereby causing the flood waters of Omaha creek to flow back over and across the lands described in plaintiff's petition." The majority opinion finds that this is not true. The plaintiff's petition alleged that the defendant "negligently constructed their bridges, by using piles in such a manner that the piles, which support the bridge structure proper, obstruct the free flow of the water in the channel of said creek and catch and hold debris which further retards and obstructs the flow of wa-

ter, and that by reason thereof the water which would otherwise flow through said channel is crowding out of the channel above and flows over the land on the west side of the defendant's said line of railway, and that when said water is so crowded out of said creek channel by said bridges it flows down, through, over, and across and onto lands in said section 1 and the other lands in said township twenty-seven (27), range eight (8), and in township twenty-eight (28), in said range eight (8), which were farmed and cropped by this plaintiff."

It does not plainly appear from the evidence and the facts or the findings of the court that either the plaintiff or the judge considered this water as a stream or any part of a watercourse. The word "flood" is used sometimes, but apparently in the sense that there is a big body of water spreading over the land, in some places a half mile wide, and, as I said before, the plaintiff in his brief expressly predicates his case upon the proposition that this water is surface water, and the plaintiff insists that in the answer of the defendant "the existence of the flood was admitted." The majority opinion appears to hold that the water complained of is "flood water" in the technical sense. I do not think that the pleadings and evidence in the case will justify such a finding.

Plaintiff has failed to prove the damages allowed by the court, and for that reason the judgment is properly reversed.