JOHN KRUEGER, APPELLEE, V. CRYSTAL LAKE COMPANY,
ET AL., APPELLANTS.

FILED FEBRUARY 26, 1924.    No. 23681.

1. Waters: WATERS OF STREAM. Where the flood-waters of a river,
   in times of high water, follow a natural channel or waterway
   into a "cut-off lake," and from thence, if they reach a certain
   height, flow into the river at a lower point in its course, such wa-
   ters are waters of the stream or lake, and not surface-waters.

2. ————: RIGHTS OF RIPARIAN OWNERS. In such a case, all own-
   ers of property fronting upon the lake are riparian owners and
   are entitled to have the waters in the flood-channels run, and the
   waters of the lake remain, in their natural condition, subject to
   the ordinary incidents and rights of use by riparian proprietors.

3. ————: ————: INJUNCTION. One who comes into equity must
   come with clean hands, and where, by reason of unlawful ob-
   struction of flood-channels, whereby its waters are replenished
   from a river, the waters of a lake recede to such an extent as to
   permit the cultivation during one of a long series of years of a
   portion of the lake bed, an owner of the land, who has aided in
   maintaining the unlawful obstructions, and has produced this
   unusual and artificial condition, is not entitled to an injunction to
   prevent other riparian owners from restoring the lake to its
   former level.

4. Injunction: WATERS: PRESERVATION OF PUBLIC INTERESTS.
   Where the result of an injunction would greatly interfere with
   the maintenance and retention of a body of water seven miles
   long, of such a depth as to permit passenger boats to ply upon it,
   which has been stocked with fish for public use by the state of
   Nebraska, and which furnishes a place of recreation and resort

for the public generally, a court of equity will, in case of doubt, incline toward the protection of the public interest as against a mere private claim which, if well founded, may be compensated by an action for damages.

5. Equity: CLAIM FOUNDED ON WRONGFUL ACTS. Where one procures and maintains a condition through the wrongful acts of others, which are ratified, confirmed and sought to be perpetuated by him, he is not entitled to the aid of a court of equity to preserve and maintain such a condition, even though the parties against whom the injunction is sought are themselves not free from fault.

APPEAL from the district court for Dakota county: GUY T. GRAVES, JUDGE. *Reversed and dismissed.*

Byron Clark, Jessɛ L. Root, Herman E. Kuppinger, J. W. Weingarten, R. E. Evans, William P. Warner and C. W. Krohl, for appellants.

George W. Leamer and Stason & Stason, contra.

Heard before MORRISSEY, C. J., LETTON, ROSE, DEAN, DAY and GOOD, JJ., SHEPHERD, District Judge.

LETTON, J.

A permanent injunction was granted by the district court restraining the defendants from diverting and conducting water from a natural watercourse through a conduit and discharging it into Crystal lake, thereby overflowing certain lands of the plaintiff. Defendants and a large number of intervening defendants have appealed.

The facts are substantially as follows: Crystal lake is a natural lake, about seven miles long, the bed of which was formerly the main channel of the Missouri river. It is somewhat crescent shaped, and is of a character known in the Missouri valley as a "cut-off lake," that variable and inconstant stream having, as is not infrequent, changed its channel; and, by silting the inlet and outlet, left the old channel, forming a basin, which is partly filled with water. In times of flood or high water in the Missouri river, when the flood-waters reached a certain height, they flowed

through a natural depression or flood-channel into, and sometimes through, the lake, until the level of the water in the river subsided below the highest point in the flood-channel. This did not happen every year, but it occurred so frequently as to maintain the level of the lake at such a height that it furnished an attractive natural resort. On the banks and around the lake are large groves, both natural and the result of planting. Part of the land adjacent to the lake has been platted into lots, blocks, and streets, many summer cottages have been erected, as well as two hotels and several club-houses. There are five public bath-houses, and a number of amusement buildings and enterprises have been erected. There are seven passenger motor-boats operating upon the lake, and the use of the lake for public and recreation purposes has continued for nearly 30 years. The city of Sioux City, Iowa, is within a very few miles, and there are a number of towns and villages near by. Consequently a large urban population makes use of the facilities for recreation furnished by the lake. The state of Nebraska has stocked its waters with food fish for public use, and its waters have been utilized by one of defendants for the cutting of ice in winter, and by the Chicago, Burlington & Quincy Railroad Company, which requires large quantities of water daily for the operation of its engines and in its repair shops, which are situated close to the bank of the lake.

From 1910 or 1911, up to the latter part of 1921 and 1922, while the water-level in the lake was lower at different times and at different seasons of the year, it maintained such an average height that its waters could be thus utilized. In 1917 the flood-water filled the lake, and ran into the river again at the lower channel. In 1922 there was deficiency in the usual precipitation, and on account of the access of flood-water from the Missouri river having been cut off by dikes, dams and obstructions erected by farmers and others who desired to prevent the flood-waters from flowing over their lands, and by reason of summer evaporation, the amount of water in the lake became largely di-

minished and the level much lower than normal. This reduction of the water-level exposed and caused to dry from 20 to 35 acres of land belonging to the plaintiff. Part of the land had formerly been covered with water and part of it was ordinarily so permeated with water that cattails, watergrass and other swamp vegetation grew thereon. In 1922 the plaintiff was able to and did bring part of this land into cultivation and he obtained a crop of corn and of potatoes. In 1911 it had been realized by persons interested in maintaining the normal level of the water in the lake that, by reason of obstructions placed in the overflow-channels of the river, the level of the water in the lake had been lowered. The predecessors in interest of defendants were threatening to remove these obstructions and allow the flood-water of the river to flow as they had been wont to do. An action was brought by Mr. Krueger and four other private individuals to procure an injunction to prevent those interested in preserving the lake from removing the dikes and embankments which obstructed the flood-water channel from the river into the lake, or cutting a channel or inlet through them, and from interfering with their strengthening the dikes, embankment, or ridge. Mr. Krueger, plaintiff here, was one of the plaintiffs in that case, and he, as one of the principals, signed the bond given to procure the temporary injunction. The temporary injunction was dissolved in 1912. Afterwards another suit was brought by one Gribble, a riparian owner upon the lake, in which the present plaintiff, and others who were interested in maintaining the artificial obstructions, were made defendants, to enjoin the defendants in that case from erecting or maintaining the dams or dikes, and for a mandatory injunction for their removal. A temporary injunction was issued. Both of these actions were dismissed before a trial, an amicable settlement and contract having been entered into between all the parties interested, whereby the lake was to be fed through a ditch or flood-channel, which had been laid out by an engineer and was to be afterwards constructed at another point, upon the giving of

Krueger v. Crystal Lake Co.

a bond in the sum of $5,000 by those interested in the latter suit, to pay damages to certain owners of land if the flow of water was not properly controlled.

The Missouri river, in one of its annual floods, having eroded its banks so as to more closely approach the lake at the point where this artificial channel was to be constructed, the parties interested, fearing that the river in flood-time, on account of this changed condition, might flow into the lake through this ditch and again make the lake the main channel of the river, by tacit agreement went no further with this work. The final result was that, unless in the case of an extraordinary and unusual flood such as occurred one year when an ice gorge had formed in the river, the flood and overflow waters were in large measure prevented from reaching the lake, and its waters diminished so as to expose part of its bed. In this condition of affairs the Crystal Lake Company, the railroad company, and a number of private individuals interested in preserving the lake, adopted the plan of conducting water, through a tile drain or conduit, from a natural watercourse, known as Jackson chute, into the bed of Crystal lake. Subscriptions were made to defray the expense, which was over $26,000. The conduit began to discharge water into the lake early in 1923. The effect of this was to raise the level of the lake to such an extent that the plaintiff was unable to use the land from which the water had receded in 1922. This action was brought by him to restrain the defendants from conducting water through the tile conduit and discharging it into the lake bed.

A large number of legal questions have been raised in the case; the pleadings are numerous, lengthy and involved, but the legal principles involved are comparatively simple. In the first place, it is clear that the defendants have no legal right to take the waters from a natural watercourse and divert them from their natural channel so as to damage the lands of others, without their consent. "*Aqua currit, et debet currere, ut currere solebat.*" So that, if the allegations of plaintiff's petition are borne out by the facts, and

there are no other controlling circumstances, he would be entitled to a permanent injunction restraining the discharge of water from the conduit into the lake to his damage.

But the maxim also applies to the natural flood-channels into Crystal lake. The evidence is undisputed that, before any obstructions were placed in the flood-channels, when the waters of the Missouri river reached a certain height, they flowed into the bed of the lake. While in the interval between the successive rises, which it is shown occur each year, and which are known as the "spring rise" and the "June flood," and between the June flood of one year and the spring rise of the next year, the shrinkage of water by means of evaporation or seepage was sufficient to lower the level of the water in the lake to a considerable extent, still the accumulation from rains, melting snows and from percolation from higher ground was sufficient to preserve the water at such an average height as to render that portion of his land, which plaintiff asserts has been damaged, of little or no use or value for agricultural purposes. The settled doctrine in this state is that no man has the right, without the consent of other riparian proprietors, to interfere with these flood-channels in such a way as to increase or diminish the water coming to other proprietors, to their injury and without their consent, and that the overflow waters of a stream flowing in an accustomed course do not cease to be a part of the stream unless or until separated therefrom so as to prevent their return to its channel. There is no more right to divert or obstruct such waters flowing in an accustomed channel than there is to divert or obstruct the waters of the stream flowing at their usual level in their natural channel. This is the general doctrine. *Chicago, B. & Q. R. Co. v. Emmert,* 53 Neb. 237; *Brinegar v. Copass,* 77 Neb. 241; *Murphy v. Chicago, B. & Q. R. Co.,* 101 Neb. 73; *Spelman v. City of Portage,* 41 Wis. 144; *Conn v. Chicago, B. & Q. R. Co.,* 88 Neb. 732; 3 Farnham, Waters and Water Rights, sec. 880; *Buchanan v. Seim,* 104 Neb. 444. Under *Buchanan v. Seim, supra,* the plaintiff has no prescriptive right to have the obstructions maintained

which prevent or exclude the flood-waters of the river from the lake.

The evidence is that, were it not for these artificial obstructions, the water in the lake would in all probability remain at about the same average level as it did for years before the natural flood-channel was obstructed, and that in such case the greater portion of the plaintiff's land which has been or will be flooded or damaged by the water discharged from the conduit would remain a part of the bed of the lake. If the evidence on behalf of plaintiff had established that the lowering of the water-level in the lake had been occasioned by natural causes, or by the acts of third parties with whom he was not co-operating, or conniving and assisting with material support, or associated in interest, and that the waters had so receded and the land dried so as to be cultivatable, and there was a reasonable probability that it would so remain, then he would be entitled to restrain the discharge of water through the conduit. But one who comes into equity must come with clean hands. When the predecessors in interest of the defendants sought to remove the unlawful obstructions which prevented the flood-waters of the river from entering the lake and maintaining its former level, plaintiff was an active participant in the injunction proceeding brought to restrain them from removing or interfering with these obstructions. The petition in that case alleges that the obstruction "is partly a natural ridge and was partly placed there and maintained by Dakota county and by the citizens thereof as a public highway, *and as a protection against the extraordinary floods and overflows of the Missouri river,*" and prays that the defendants be enjoined "from interfering with plaintiffs while they are protecting their said lands from the floods of the Missouri river by strengthening and repairing the said ridge and keeping it in the condition it now is."

The legal principles which are applicable to the reliction or emergence of submerged land are much the same as prevail with respect to accretions. A riparian owner is en-

titled to any additions made to his land by imperceptible degrees which are caused by the operation of natural forces, or even produced by the operation of third parties with whom he is not in privity, has no causative or collusive connection, or whose purposes he in no wise aids, abets or procures. But, if by the result of his own unlawful action, or by the action of third parties whose acts and doings in this regard, he countenances, aids, abets or causes a change in the shore-line made for the purpose of increasing his estate, he cannot take advantage of this as against other riparian owners whose interests are affected. *Brundage v. Knox*, 279 Ill. 450, opinion by Chief Justice Carter. So in this case, cutting off the flow of flood-waters which served to replenish the lake caused, or contributed to cause, the land which plaintiff cultivated in 1922 to be dry enough to be thus utilized. He was *in pari delicto* in procuring the channel to be obstructed—even though the evidence fails to show his physical participation in the construction of the dams or dikes—because by his institution and active participation in the injunction suit he prevented their wrongful acts from being interfered with and caused the unlawful obstructions to remain. He aided to deprive the defendants, who are also riparian owners, of the benefits of the water flowing from the river, to which they were rightfully entitled, and he is not entitled to the aid of a court of equity to preserve and maintain a condition which he obtained through the wrongful acts of others, which were ratified, confirmed, and sought to be perpetuated by him. Each riparian owner was entitled to have the natural water-level uninterfered with except by natural causes, or as the law allows. If the evidence had disclosed that plaintiff at this time is authorized to enter upon the lands of others and remove the unlawful obstructions in the flood-channels, then the court, applying the maxim, "He who seeks equity must dc equity," might properly grant the relief he seeks, but only upon the condition that he restore the natural conditions which have been interfered with; but, it not being

shown that full relief can be granted in this way, the court should not interfere between wrong-doers.

A number of other points have been raised and discussed by counsel, but it is unnecessary to consider them. It may be said that some, but not all courts, take the view expressed by the court of appeals of New York, in a comparatively recent case, as follows: "The ownership of property will be protected unless there are other considerations which forbid, as inequitable, the remedy of the prohibitive or mandatory injunction. If the protection of a legal right would do a plaintiff but comparatively little good and would produce great public or private hardship, equity will withhold its hand and remit the plaintiff to his legal rights and remedies. A court of equity is not bound to decree an injunction where it will produce great public or private mischief, merely for the purpose of protecting a technical or unsubstantial right." *McCann v. Chasm Power Co.*, 211 N. Y. 301. While there is much to be said in support of this view, we are reluctant to stand upon such a broad generalization, since it may not in all cases protect private property rights. The public nature of Crystal lake is to be considered and the court will incline to protect the public interest when the right to injunctive relief is not clear.

The evidence is not sufficient to show that the portion of plaintiff's lands now overflowed could have been reclaimed and used for cultivation except for the unlawful acts mentioned. This being the state of the evidence, whether defendants rightfully or wrongfully diverted the water from Jackson chute cannot affect any property or personal right of the plaintiff, and he is therefore not entitled to an injunction. The judgment of the district court is therefore reversed and the action of plaintiff dismissed, and since there seems to be fault on both sides, each party must pay the costs incurred by him, or it, in the district court, defendants recovering their costs in this court.

REVERSED AND DISMISSED.