MARTIN U. BLOCK ET AL., APPELLEES, V. MEINERT J. FRANZEN, JR., ET AL., APPELLANTS.

76 N. W. 2d 446

Filed November 23, 1956. No. 33992.

*William S. Padley*, for appellants.

*Smith Brothers*, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

Plaintiffs are the owners and a tenant of a farm of 160 acres. Defendants own a farm of 200 acres adjacent to plaintiffs' land on the south. A large, landlocked pond is partly on each piece of land, lying across the common boundary. Defendants built a dike along the north side of their land so as to prevent water flowing into the pond on plaintiffs' land from reaching the area of the pond on defendants' land.

Plaintiffs petitioned for an injunction restraining the maintenance of the dike and ordering its removal. Plaintiffs prayed for crop damage. Defendants resisted the action and by cross-petition sought an injunction against plaintiffs maintaining dams and ditches on their land, and an order requiring plaintiffs to restore their land to its natural condition.

The trial court granted the prayer of plaintiffs' petition, assessed crop damage, and denied defendants' cross-petition.

Defendants appeal. The denial of the cross-petition is not assigned as error.

The amount of crop damage is not challenged as to amount, provided plaintiffs are entitled to recover at all.

We affirm the judgment of the trial court.

We hereafter use the term plaintiffs as owners of the land.

The land to the north of plaintiffs' land is rolling and hilly. Some of that surface condition is on the north of plaintiffs' land. The elevation flattens out to the southern portion of plaintiffs' land.

The pond here involved is described as covering some 50 acres of land. Two-thirds of that area is on defendants' land. The shore line of the pond on defendants' land is abrupt and high so that it is relatively permanent. The shore line on plaintiffs' land does not have that containing elevation. It advanced and receded as the water level in the pond increased or decreased.

The pond has been a permanent body of water through the years, except that in periods of drought it "dried up" on occasion. Witnesses testified that it had been there for many years, and that they had boated, hunted, and skated on it. The pond was shallow; however, it is a fair conclusion that it was deeper on defendants' land.

In a state of nature surface water came upon plaintiffs' land in fairly defined waterways from the northwest, near and at the north line; from the north about the center of plaintiffs' land; and from the north and northeast at the northeast portion of plaintiffs' land. These waters in a state of nature flowed across plaintiffs' land and ultimately came to rest in the pond. There the water remained except as it sank into the soil or evaporated.

Many years ago, sometime before 1937, a road was graded along the line east and west between the two pieces of land and through the ponded area. We find no evidence that that road materially interfered with the movement of water from the ponded area on the north to the ponded area on the south. In 1952 the road was again graded and the elevation raised. A 3-foot culvert was placed in the road to permit water to flow from the north portion of the pond to the south por-

tion. The roadway blocked the flow of water between the two areas except at the culvert.

In 1946 plaintiffs placed an irrigation well on their land at a high point west of the center of the land at the north line, and in connection therewith built laterals and dams to which we shall refer in some detail. They built a lateral to the west and then southwest to their west line. Here it served as a dam to divert waters entering their land and flowing across it in small amounts. They also built a ditch for about one-eighth of a mile from their northwest corner south along the fence line where it connected with an old drainageway to the pond. It appears that it was designed to take care of moderate amounts of water that might reach their lands in that area. Then, east of their west line, they built three terraces running north and south. These were designed to accept greater volumes of water and carry it down the corn rows between the terraces so as to serve irrigation purposes. The runoff from these operations all reached the pond on plaintiffs' land. There is no showing of a substantial increase of water in volume reaching the pond from this operation.

In times of high runoff of storm water, the greatest volume of water entered plaintiffs' land in a well-defined watercourse at about the center of the north line. In a state of nature, it then flowed south in an irregular course in a defined channel to about the center of the farm. There it flowed in a diffused course, which in time of heavy rainfall was sometimes 100 yards wide, into the pond on plaintiffs' land.

Plaintiffs placed a dam across this waterway on the north to carry an irrigation lateral to the east. They placed a flume in the dam to admit the passage of the waters coming from the north. This washed out, in part, in 1948. It has not been fully replaced and it is not necessary to do so for irrigation operations. The evidence is that the remaining portion of this dam in

nowise interferes with or accelerates water coming from the north.

Plaintiffs back-furrowed two ridges, 10 corn rows apart, running directly south from this waterway where it entered plaintiffs' land. Floodwaters washed out the soil between those rows so that there was a new drainageway created in place of the natural one. In the years since, silt in the lower end has been removed and put upon the banks and, as of the time of trial, this drainageway extended to within 200 feet of plaintiffs' south line. There it empties water into the pond. There is evidence that water, restricted in the width of flow, would result in less sinking into the soil. No witness undertook to say that there was an appreciable increased amount of water reaching the pond as a result of this artificial drain.

In times of excessive rainfall, water coming upon plaintiffs' land from the northeast flooded the area of their buildings. Plaintiffs built a dam and ditch to divert this water around the buildings. The testimony is that part of this water was used for irrigation. A part was diverted into a road ditch where it flowed south along the east side of plaintiffs' land. Plaintiffs' evidence is that it later went back across plaintiffs' land upon an alfalfa field and pasture and that ultimately the excess went into the pond. Defendants' expert witness, from elevations of the land which he had determined, testified that this water followed the roadway to the southeast end of the land, then followed a road ditch west into the pond on plaintiffs' land. In any event, this water of undisclosed amount ultimately reached the pond on plaintiffs' land. There is no showing that this diversion increased the volume of water flowing into the pond.

When plaintiffs began to irrigate their land they changed the method of farming so as to run corn rows north and south. There was an effort to show that irrigation water reached the pond and increased the volume

of water there. That effort failed. Plaintiffs testified that there was no flow-off of irrigation water into the pond. One witness for defendants testified that he saw water ponded on plaintiffs' land in 1954. He assumed it was irrigation water. He did not testify to having seen irrigation water enter the pond.

We find no sustaining evidence to the effect that a greater amount of water reached the pond as a result of plaintiffs' alteration of the natural waterways or as a result of irrigation.

If we were to assume that more water from irrigation or decreased absorption in the soil reached the pond, the fact remains that no one undertook to determine the relative amount of water from those sources in comparison with the total waters reaching the pond, or to determine the effect of such waters, if any, on the water level of the pond or the waters remaining in the pond.

It may be that the water reached the pond in greater velocity than it would in its natural state. It is clear that whatever its velocity, it entered the pond on plaintiffs' land. The presence of the road grade, particularly after the elevation of it in 1952, caused the water to pond on plaintiffs' land. From that point there is no evidence of increased velocity in the flowage onto defendants' land nor of damage thereto as a result.

Defendants contend that the pond on plaintiffs' land is gradually filling with silt and thus forcing defendants' land to take an increasing burden of the water. There is evidence to that effect. One witness testified, without contradiction, that the silt was raising the level of plaintiffs' land at least 25 years ago and that it had continued since. That was long before any of the changes in the watercourses by plaintiffs. Another witness testified to silt flowing onto plaintiffs' land in the water from the north and particularly in 1948 when large quantities of soil were eroded onto plaintiffs' land and into the pond. There is evidence that soil eroded from the artificial drain down the center of the plaintiffs' land. The amount

so eroded is purely speculative. The evidence is that in the natural state those drains eroded and silted the pond. There is no showing of silting from irrigation water. The silt from whatever source was deposited on plaintiffs' land both by the check of velocity when the water reached the pond, and by the effect of the highway elevation.

In the fall of 1953 and the spring of 1954, defendants built a dike along the north side of their land. This began at high ground at the west, and went half a mile east and then south at the east line to high ground there. It effectively prevented any of the waters ponded on plaintiffs' land from reaching the defendants' land south of the dike. In the summer of 1954, the runoff of a heavy rain to the north of and on plaintiffs' land ponded on plaintiffs' land and in the roadway ditches. None of it reached the defendants' land. Plaintiffs' crop damage was caused by that water.

Defendants have thus relieved their land from the entire burden of ponding these runoff waters.

It is against the maintenance of that dike that plaintiffs complain.

Defendants here seek a reversal of the trial court's decree and a decree determining their right to maintain the dike on their land. This argument is premised on the contention that the waters in the pond are surface waters and that the rules as to the right to protect against surface waters apply.

The pond here involved is of a permanent nature. It exists in a natural depression in the earth's surface. It serves as a receptacle for waters draining into it from plaintiffs' land and other lands to the north. It has so served for many years.

"The term 'lake,' as used in the Restatement of this Subject, comprehends a reasonably permanent body of water substantially at rest in a depression in the surface of the earth, and also the depression, both depression and body of water being of natural origin or a part

of a watercourse. \* \* \* A distinction is sometimes made between lakes and ponds; the term 'lake' connoting a large body of water and the term 'pond' connoting a small body of water ordinarily containing considerable aquatic growth. But since this distinction is based mainly on the size of the body of water, it is not essential for legal purposes, and the term 'lake' as here defined includes both large and small bodies of water. \* \* \* a lake is distinguished from a stream by the fact that in the former the body of water is substantially at rest while in the latter it has a perceptible flow. \* \* \* To constitute a lake, a body of water must have a reasonably permanent existence. Many lakes have a permanent body of water. But the body of water need not be permanent in order to constitute a lake. Thus a body of water which occasionally dries up in periods of drought is still a lake. On the other hand bodies of water, even though of considerable size, which collect only in times of heavy rain, flood or melting snow, and which soon dry up, are not lakes within the meaning of that term as here defined." Restatement, Torts, § 842, p. 324.

Accordingly the rules with reference to waters in lakes apply here.

The question then comes: Do the waters that enter a lake and become a part of the body of water in the lake retain the character of surface waters? We have held that they do not. In Lackaff v. Bogue, 158 Neb. 174, 62 N. W. 2d 889, it was stated: "Surface waters comprehend waters from rains, springs, or melting snows which lie or flow on the surface of the earth but which do not form part of a watercourse or lake."

Defendants rely on the language quoted immediately following the above from 67 C. J., Waters, § 286, p. 863: " 'Surface waters cease to be such when they empty into and become part of a natural stream or lake, but they do not lose their character as such by reason of their flowing from the land on which they first make

their appearance onto lower land in obedience to the law of gravity, or by flowing into a natural basin from which they normally disappear through evaporation or percolation, * * *.' "

Defendants argue that the waters here are waters "flowing into a natural basin from which they normally disappear through evaporation or percolation," and hence do not lose their character as surface waters although they "become part of a natural * * * lake."

As construed by defendants the rule is self-contradictory.

Basin is a word of general and quite variable meaning. How is it used here? The text from which the quote was taken relies upon Thompson v. Andrews, 39 S. D. 477, 165 N. W. 9. The holding of the court was that "water (sic) did not lose their character as surface waters simply because they remained ponded in a basin for a time until they disappeared through evaporation or percolation, leaving the bottom of the basin dry. Surface waters are surface waters and permanent waters are permanent waters, whether situate in a state recognizing the rights of drainage to be an easement or in one treating surface waters as a 'common enemy,' * * *. That normally the drainage into this basin was so limited as to soon disappear and leave the soil suited for cultivation is undisputed. The normal, and not the abnormal, conditions must determine the rights and burdens attaching to lands. Whether waters are of a nature to be treated as 'surface waters' for the purposes of drainage must, in each case, be a question of fact to be determined from the evidence."

The distinction then is in the fact of the permanency of the body of water in the lake.

Here the waters in the pond clearly come within the classification of permanent waters in a lake. The rules as to the right to defend against surface waters do not apply.

The question then is: Do the defendants have the

right to dam the lake so as to prevent its use by waters under the facts disclosed by this record?

The rules applicable here are those rules that apply to obstructions placed in natural watercourses. Although there was no outlet to the pond on defendants' land, that pond did furnish a natural outlet to waters flowing into it on plaintiffs' land. Defendants have closed that outlet.

In discussing a similar situation, the Supreme Court of North Dakota held: "The Parker slough has been and is a permanent body of water. It has there existed for a period of over thirty-five years. It does not and did not during all of these years drain off naturally through this draw. The only method of draining it is by this tile construction or by some similar artificial construction. Although its source of water supply comes from surface waters running down upon adjacent territory through the winter snows or spring or other rains, nevertheless such waters, when they reached this slough, even in a state of nature, there remained except when the slough was overflooded in seasons of unusual moisture. There they remained for purposes of evaporation or seepage in the soil, and there a pond was constituted. As such these waters in such slough lost their characteristics as surface waters. They became waters of such pond, and the principles of law applicable thereto are similar to those applicable to watercourses; the principal distinction being that in a pond or lake the waters are substantially at rest, while in a stream or watercourse they are in motion." Froemke v. Parker, 41 N. D. 408, 171 N. W. 284.

In Krueger v. Crystal Lake Co., 111 Neb. 724, 197 N. W. 675, with reference to overflow waters going into a "cut-off" lake, we held: "There is no more right to divert or obstruct such waters flowing in an accustomed channel than there is to divert or obstruct the waters of the stream flowing at their usual level in their natural channel."

In Ricenbaw v. Kraus, 157 Neb. 723, 61 N. W. 2d 350, we restated the established rule that where water is impounded upon land by natural conditions whereby a pond is formed, the owner of such land has no lawful right to remove an impediment to its flowage and thereby cause such water to flow upon the land of another to his damage.

This case is largely decided by Pospisil v. Jessen, 153 Neb. 346, 44 N. W. 2d 600. In that case plaintiff by artificial means drained a pond of a temporary character so that the waters flowed onto and across lands of the defendant in a natural course of drainage. Defendant then constructed a dike across his land so as to obstruct the natural flow of water from plaintiff's land and caused it at times to back up and spread out over plaintiff's land. We held: "As to the dike which defendant constructed it was in the natural course of drainage for water coming down from plaintiff's land. It was constructed for no other purpose than to prevent the flow of this water over his land and on down over a natural course to ultimately empty into a creek some miles away. The dike diverted the water from its natural course and caused it to back up and inundate plaintiff's land.

"This under the principles announced he had no right to do. The plaintiff was entitled unqualifiedly to have the dike removed to the extent that it interferes with the free flow of water in the natural course of drainage and to an injunction restraining its maintenance or reconstruction."

In Davis v. Londgreen, 8 Neb. 43, we held: "The owner of a natural pond or reservoir wherein the surface water from the surrounding land accumulates, and from which it has no means of escape except by evaporation or percolation, cannot lawfully, by means of a ditch, discharge such water upon the land of his neighbor, to his injury."

This rule has been consistently followed in this state

down to and including Skolil v. Kokes, 151 Neb. 392, 37 N. W. 2d 616.

In the situation here we see no essential difference between discharging water upon a neighbor by a ditch or by a dike. Either means accomplishes the unlawful result.

In Mapes v. Bolton, 89 Neb. 815, 132 N. W. 386, we stated this rule: "A lower proprietor may not unnecessarily obstruct a natural drain upon his own premises without the upper proprietor's consent, so as to collect surface water and cast it back upon his neighbor's farm where it would not appear but for that obstruction, and to injury of his neighbor's crops and land." We cited this language with approval in Town of Everett v. Teigeler, 162 Neb. 769, 77 N. W. 2d 467. The rule has application here.

In Graham v. Pantel Realty Co., 114 Neb. 397, 207 N. W. 680, we quoted, with approval, this language from Boyd v. Conklin, 54 Mich. 583, 20 N. W. 595, 52 Am. R. 831: "A rural land owner has no right to put up such artificial barriers as will flood his neighbor's land with water that would otherwise escape over his own, for the mere purpose of reclaiming the bed of a pond that has always been on his premises, and of getting rid of the inflow."

Threaded through defendants' brief here is the contention that because of the silting this pond is gradually filling up with soil on plaintiffs' side of the land so as to put more and more of the burden of this water on defendants' land. We have heretofore reviewed the evidence as to that matter. The rule is stated in Krueger v. Crystal Lake Co., *supra*: "A riparian owner is entitled to any additions made to his land by imperceptible degrees which are caused by the operation of natural forces, or even produced by the operation of third parties with whom he is not in privity, has no causative or collusive connection, or whose purposes he in no wise aids, abets or procures."

The judgment of the district court is affirmed.

AFFIRMED.